**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HARRY DUNN and DANIEL HODGES, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *in his official capacity as President of the United States*, <br><br>     1600 Pennsylvania Avenue, NW <br>     Washington, DC 20500 <br><br> TODD BLANCHE, *in his official capacity as Acting Attorney General of the United States*, <br><br>     950 Pennsylvania Avenue, NW <br>     Washington, DC 20530 <br><br> SCOTT BESSENT, *in his official capacity as Secretary of the United States Department of the Treasury,* <br><br>     1500 Pennsylvania Avenue, NW <br>     Washington, DC 20220 <br><br>     *Defendants*. | Civil Action No. _____ |

**COMPLAINT**

1.      In the most brazen act of presidential corruption this century, President Donald J. Trump has created a $1.776 billion taxpayer-funded slush fund to finance the insurrectionists and paramilitary groups that commit violence in his name.

1

2.      The fund, styled the "Anti-Weaponization Fund," is illegal. No statute authorizes its creation, the settlement on which it is premised is a corrupt sham, and its design violates the Constitution and federal law.

3.      The Fund endangers the lives and safety of Plaintiffs Harry Dunn and Daniel Hodges—officers who defended the Capitol on January 6, 2021—in two ways. First, by its very existence, the Fund encourages those who enacted violence in the President's name to continue to do so. Dunn and Hodges already face credible threats of death and violence on regular basis; the Fund substantially increases the danger. Second, if allowed to begin making payments, the Fund will directly finance the violent operations of rioters, paramilitaries, and their supporters who threatened Plaintiffs' lives that day, and continue to do so.

4.      To prevent the public financing of paramilitary organizations in the United States, and to protect Plaintiffs from further violence, the fund must be dissolved. Dunn and Hodges bring this case to obtain that relief.

5.      In January of this year, President Trump, his sons Eric and Donald Jr., and the Trump Organization sued the IRS for $10 billion in alleged damages arising from the 2017 and 2020 leaks of their tax returns. Compl., *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. Jan. 29, 2026), ECF No. 1.

6.      That lawsuit was frivolous.  Because Trump, as the sitting President, was both the plaintiff and in direct control of all defendants, *Trump v. IRS* lacked adversity, meaning there was no Article III case or controversy, and no subject matter jurisdiction. Trump all but conceded the lack of adversity; earlier this year, he described the case as requiring him to "work out a settlement with myself."

7.     With help from two of his cabinet secretaries, Trump has now done just that. On May 18, Defendant Todd Blanche, the Acting Attorney General of the United States, announced that the Department of Justice, on the Treasury Department and IRS's behalf, had agreed to settle the case for $1,776,000,000. The money, Blanche announced, would be paid into an "Anti-Weaponization Fund." Letter from Todd Blanche (May 18, 2026) (Ex. 1); *see also* Settlement Agreement, *Trump v. IRS*, No. 1:26-cv-20609 (May 18, 2026) (Ex. 2).

8.     According to the Department of Justice, the Anti-Weaponization Fund will be used to compensate people who have "suffered weaponization and lawfare," and "will have the power to issue formal apologies and monetary relief." Press Release, Justice Department Announces Anti-Weaponization Fund (May 18, 2026) (Ex. 3).

9.     Although Trump and his cronies have been secretive about the Fund's ends, reporting leaves no doubt that it will be used, among other purposes, to pay the nearly 1,600 people charged with attacking the Capitol on January 6, 2021.

10.     Plaintiffs, U.S. Capitol Police Officer (Ret.) Harry Dunn and Metropolitan Police Department Officer Daniel Hodges, are two of the many police who risked their lives defending the Capitol from that insurrection. Since then, they have spoken out in Congress, at trial, and in the media about that attack, so that its history is not forgotten or rewritten. As a consequence of that work, Officers Dunn and Hodges have been harassed by those who attacked the Capitol, and have received a series of credible death threats.

11.     The Anti-Weaponization Fund will both compensate and empower the very people making those threats. Militias like the Proud Boys will use money from the Fund to arm and equip themselves. The Fund will grant their pasts acts of violence legal imprimatur. And, most chillingly,

the Fund will signal to past and potential future perpetrators of violence against Dunn and Hodges

that they need not fear prosecution; to the contrary, they should expect to be rewarded.

12.     Dunn and Hodges did not back down on January 6. Instead, they held the line to

defend democracy and the rule of law. They bring this case to do so once again.

## PARTIES

13.     Plaintiff Harry Dunn is a former officer of the United States Capitol Police, who

served from 2008 until his retirement in 2023. Dunn helped to defend the Capitol on January 6,

2021.

14.     Plaintiff Daniel Hodges is an active officer of the Metropolitan Police Department,

serving since 2014. Hodges helped to defend the Capitol on January 6, 2021.

15.     Defendant Donald J. Trump is the President of the United States. He is sued in his

official capacity.

16.     Defendant Todd Blanche is the Acting Attorney General of the United States and

the head of the Department of Justice. He is sued in his official capacity.

17.     Defendant Scott Bessent is the United States Treasury Secretary. He is sued in his

official capacity.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because the

claims alleged arise under the Constitution and laws of the United States.

19.     This Court has personal jurisdiction over the Defendants, who are officers of the

United States sued in their official capacities pursuant to Federal Rule of Civil Procedure 4(i).

20.     Venue is proper in this District under 28 U.S.C. § 1391(e). Defendants are officers

of the United States sued in their official capacities, and a substantial part of the events giving rise

to Plaintiffs' claims occurred in this District.

**STATEMENT OF FACTS**

**I.    On January 6, 2021, Plaintiffs and their fellow officers defended the U.S. Capitol from a violent assault.**

21.    On January 6, 2021 ("January 6"), rioters attacked the Capitol and those inside to stop the certification of the 2020 presidential election. Joe Biden had been elected president the previous November, and that victory was set to be certified in a proceeding overseen by then-Vice President Mike Pence. But shortly after noon on January 6, rioters trespassed over the Capitol grounds' restricted perimeter and tried to break into the building to stop the election's certification. Hours of hand-to-hand combat ensued, as police officers tried to prevent the rioters from entering the building and killing elected officials and their staff.

22.    The melee began on the Capitol's west front. Rioters broke down the barriers—made of bike racks, signs, and snow fencing—that delineated the restricted perimeter, then rushed to an interior barrier where a line of Capitol Police officers stood. There the officers, soon joined by reinforcements from the D.C. Metropolitan Police Department, tried to hold the line as an increasingly violent mob worked to push its way through. The conflict escalated, and the mob—already trespassing—turned violent. Rioters assaulted officers, sprayed them with chemicals, and hit them with pipes, tools, and the bike racks and stolen police equipment that were now strewn about.

23.    Sometime after 2:00 p.m., the line of officers was overwhelmed, and the rioters streamed up to the stage that had been built for the inauguration, and then to the terrace immediately surrounding the Capitol building. Members of the mob smashed building windows and forced their way inside, opening the doors to let thousands of fellow agitators join. As rioters stalked the halls, staffers, journalists, and members of Congress hid in offices, hoping not to be found by people screaming "hang Mike Pence!" and "Where's Nancy [Pelosi]?" The mob

eventually forced its way into the Senate chamber, where the Vice President and others had been just minutes before. Triumphant rioters raced to the dais, pumping their fists in celebration. Having accomplished their goal, the rioters did not know what to do next, and milled about the chamber as the violence continued outside.

24.     Out on the Capitol's west—and later, east—front, officers fought against the advancing mob. Rioters punched police, speared them with flagpoles, attacked them with tasers and stolen riot shields, and tried to drag them into the crowd. For three hours in the enclosed tunnel connecting the Capitol to the inaugural stage, rioters engaged in an almost medieval style of combat, pushing exhausted and outnumbered police to get into the building in a "heave-ho" rhythm, nearly crushing officers as they did. Through all of this, amid the fighting and screaming, flash bangs exploded, fire retardant shot into the air, and chemical spray filled the tunnel. Many officers were injured in this fight to defend this entrance, some gravely.

25.     After several hours, Capitol Police and Metropolitan Police Department officers were joined by national guard forces from Virginia, Maryland, and elsewhere, and were finally able to get control of the crowd and expel the mob from the Capitol.

26.     Plaintiffs Harry Dunn and Daniel Hodges were among the officers who defended the Capitol that day.

27.     Officer Dunn initially deployed to the Capitol's inaugural stage—sometimes called the "lower west terrace"—where the mob first congregated. From the stage, Dunn saw rioters attack police with flagpoles, bike racks, and thrown objects. Many officers he saw were bloodied, others were screaming, having been blinded by the chemical irritants that had been sprayed at them. Later, after the Capitol building was breached, Dunn repositioned to a stairway inside the

Capitol, where he protected injured officers. Inside the building, rioters screamed racial epithets at Dunn, who is Black.

28.     Like Dunn, Officer Hodges defended the Capitol's west front. Hodges was (and remains) a member of the Metropolitan Police Department, and January 6 was his first time at the Capitol. Making his way to the building, he was separated from his platoon, hit from above with a heavy object, kicked in the chest, and driven to the ground. Shortly thereafter a rioter grabbed Hodges by the face and tried to gouge out his eyes. Hodges shook him off, and eventually made his way to the tunnel connecting the Capitol building to the inaugural stage. There, he joined in some of the most furious fighting that day, as police tried to stop the mass of rioters from flooding into the building. In the rushing crowd of the mob, Hodges was nearly crushed between metal doors by the enraged attackers. He later said that he thought, "this could be the end."



*Officer Hodges is nearly crushed by rioters in a Capitol door*

29.     Many of the other officers who defended the Capitol and the elected officials inside that day did not expect to survive. One officer trapped in the crowd heard rioters scream "[k]ill him with his own gun" as they grabbed ammunition magazines from his belt.

30.     Taking stock, Matthew Graves, the former U.S. Attorney for the District of Columbia, said January 6 was "likely the largest single-day, mass assault of law enforcement

officers in our nation's history." Approximately 140 officers were recorded as injured, though that number likely vastly undercounts the number of police who did not report their injuries (among other reasons, in order to keep working on January 6 and the days that followed). One officer—Brian Sicknick—died on January 7 of a stroke after having been pepper sprayed during the attack. Four other officers died by suicide in the months that followed.

## II. Subsequent investigation revealed that paramilitary groups like the Proud Boys helped to lead the January 6 attack.

31. The January 6, 2021 attack was not a spontaneous action, but rather a planned insurrection orchestrated in part by paramilitary groups like the Proud Boys.

32. The Proud Boys are a neo-fascist paramilitary organization formed in 2016. Prior to the attack on the Capitol, they were notable mostly for picking street fights with supposed ideological foes, and for participating in events like the 2017 "Unite the Right" white supremacist rally in Charlottesville, Virginia. In 2020, members of the group vandalized two historically Black churches in Washington, D.C., burning a "Black Lives Matter" sign. The group and several of its members were ordered to pay over $1 million, but refused.

33. The Proud Boys have long expressed loyalty to Defendant Donald Trump, frequently assaulting his enemies. Trump in turn expressed loyalty to them, telling the Proud Boys in a presidential debate to "stand back and stand by." Enrique Tarrio, at the time the group's chairman, responded: "Standing by, sir."

34. Given the group's loyalty to the President, it was unsurprising that members were leaders in the attack on the Capitol. Working in teams, Proud Boys members removed barricades around the Capitol grounds, and encouraged other rioters to advance. They coordinated over the encrypted messaging service Telegram, and organized targeted attacks on the building's western

and northern fronts. They confronted and sprayed chemical irritants onto officers defending the building. And they were some of the first rioters inside the building, leading others in.

**III.    President Trump granted blanket clemency to the January 6 insurrectionists, who promised revenge.**

35.    On January 20, 2025, Donald Trump fulfilled a campaign promise and pardoned or commuted the sentences of nearly 1,600 rioters who had been charged for their roles in the attempted insurrection.

36.    Soon after learning of Trump's acts of clemency, rioters began expressing their plans to seek revenge.

37.    Enrique Tarrio, the onetime leader of the Proud Boys, said that "[t]he people who did this, they need to feel the heat" and that "success is gonna be retribution." The California chapter of the Proud Boys added: "We'll never forget, we'll never forgive."

38.    One January 6 rioter warned those holding other rioters "hostage": "You are on notice. This is not going to end well for you." Another said that he would "storm the Capitol again for Donald Trump" and "start a militia for Donald Trump." And Jacob Chansley, the "QAnon Shaman" known for attacking the Capitol in a horned headdress, posted, "THANK YOU PRESIDENT TRUMP!!! NOW I AM GONNA BUY SOME MOTHA FU*KIN GUNS!!!"

39.    Right-wing activist Ivan Raiklin, who was at the Capitol on January 6, 2021, listed Dunn and Hodges by name on a "retribution list."

40.    These threats of violence are made plausible by the fact that so many rioters, since receiving clemency, have engaged in further violent conduct. The Proud Boys, for instance, held street fights with ideological foes, stormed a library, and threatened "War" after Donald Trump was criminally convicted in Manhattan. Rioter Edward Kelley was sentenced to life in prison for conspiring to murder the FBI agents who had initially investigated him. Rioter Christopher

Moynihan was charged for threatening to kill House Minority Leader Hakeem Jeffries. And rioter Kene Brian Lazo was arrested for sexually assaulting a child. In total, at least 33 pardoned insurrectionists to date have drawn new criminal charges, ranging from illegal gun possession and assault to kidnapping and rape.

## IV. Dunn and Hodges have faced persistent threats of violence since Trump issued his pardons, and have taken steps to protect themselves and their loved ones.

41. Since January 6, Plaintiffs Dunn and Hodges have continued to speak out about the horror of that day, so that its history is neither forgotten nor rewritten. They have variously testified in Congress, in state legislatures, at trial, and in the media.

42. As a result, both men are targets of January 6 rioters and their supporters generally, and the Proud Boys specifically.

43. Dunn, for instance, has gotten many death threats online. Examples include:

- "Put a gun in your mouth and pull the trigger. You're fucking worthless. Nobody fucking cares about bitches like you fuck the police."

- "I know Big Daddy Trump has not forgotten about your dumb, weak ass self! Treason equals say [sic] in court, then public execution. I am so going to love 2026!"

- "I pray I cross paths with you cuz I will square up with you in a heart beat . . . And for the record you will always be a second class citizen fucking nigger."

- "go take a long walk on a busy highway."

44. Dunn has also received many phone calls from insurrectionists or their supporters. One caller read off Dunn's home address and the names of Dunn's parents, intimating that violence was a possibility. Dunn's parents have also received threatening calls, and their house has been "swatted," indicating that insurrectionists or their supporters know where Dunn's family lives.

10

45.     Because of these credible and persistent threats to Dunn and his family, police ran a patrol by his house twice a day for over a year. Dunn has also taken his own steps to protect himself, buying firearms and spending a significant sum of money to secure his home and digital identity. Nevertheless, the constant threat of violence—coupled with the horror of January 6 itself—has taken a toll, and Dunn has been diagnosed with Post-Traumatic Stress Disorder.

46.     Like Dunn, Officer Hodges has dealt with persistent threats of violence or murder. People have sent him instructions for how to kill himself through strangulation with a noose, and suffocation with a bag. One person remarked, "Lets make Dan Hodges famous. Where does he live? Any wives or kids?" On another occasion, someone wrote, "Your time is over faggot, same for your lying cock sucker @DCPoliceDept and capitol police. Justice is coming, and it's riding on a pale horse."[1] One person even sent Hodges a graphic—and apparently real—video of a man shooting himself in the head.

47.     Like Hodges, Dunn has taken steps to protect himself by concealing information about himself, his habits, and his family. Among other things, Dunn has used online identity-protection services and now regularly carries his service weapon even when he is off duty.

48.     In addition to threats from rioters generally, Dunn and Hodges face threats and confrontations from the Proud Boys specifically.

49.     For instance, at the "Principles First" conference in 2025, members of the Proud Boys, including Enrique Tarrio, trailed and filmed Hodges and Dunn as they walked through a lobby, taunting the officers as cowards, traitors. One told the officers to "run from me, motherfucker." At the same conference, someone identifying himself as "Enrique T." called in a

---

[1] "Pale horse" is a Biblical allusion symbolizing imminent death. *See* Revelation 6:8.

bomb threat, saying that enemies of "Emperor Trump" "all deserve to die," and calling out a Capitol Police officer specifically. (Tarrio later denied that he had made the threat.)

50. On another occasion, after Dunn made an appearance on cable television, the Proud Boys confronted him in the television network's lobby. As at the conference, they harassed him and tried to provoke a fight.

**V.  Trump filed a frivolous lawsuit against his own administration, and demanded $10 billion in alleged damages from the leak of his tax returns.**

51. In or around 2019, Charles Littlejohn, a former IRS contractor, disclosed Trump's, his sons', and the Trump Organization's tax return information to news organizations, which published that information in articles appearing between 2019 and 2022.

52. Littlejohn pleaded guilty to federal criminal charges arising from the leaks in October 2023. *See* Information, *United States v. Littlejohn*, No. 1:23-cr-00343 (D.D.C. Sept. 29, 2023), ECF No. 1; Tr. of Oct. 12, 2023, Plea Hr'g, *id.* (Oct. 23, 2023), ECF No. 13.

53. In January 2026, President Trump, his sons, and the Trump Organization filed suit against the IRS and Treasury Department in the Southern District of Florida. They sought $10 billion in damages from the United States based on the Littlejohn leaks. Compl*., Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. Jan. 29, 2026), ECF No. 1.

54. The complaint asserted two claims for monetary relief.

55. Count I asserted a claim under 26 U.S.C. §§ 6103 and 7431(a)(1) for unauthorized disclosure of tax return information.

56. Section 6103 generally prohibits the disclosure of return information by federal officers and employees, and § 7431(a)(1) supplies a civil cause of action against the United States when such disclosures are made by "any officer or employee of the United States." 26 U.S.C. § 7431(a)(1).

57.     Section 7431 sets damages at the greater of $1,000 per unauthorized disclosure, 26 U.S.C. § 7431(c)(1)(A), or actual and punitive damages, *id.* § 7431(c)(1)(B).

58.     Section 7431 imposes a two-year statute of limitations that runs from the date the plaintiff knew or reasonably should have known of the unauthorized disclosure. *Id.* § 7431(d).

59.     Count II asserted a claim under the Privacy Act of 1974, 5 U.S.C. § 552a.

60.     The Privacy Act provides a civil remedy against federal agencies for the unlawful disclosure of records they maintain. *See* 5 U.S.C. § 552a(g)(1)(D), (g)(4).

61.     Privacy act claims require proof of actual damages. *FAA v. Cooper*, 566 U.S. 284, 295, 297–98 (2012).

62.     Privacy Act claims, like claims under § 7431, are subject to a two-year statute of limitations that runs from the date the claimant knew or had reason to know of the adverse action. 5 U.S.C. § 552a(g)(5).

63.     The *Trump v. IRS* lawsuit was frivolous.

64.     Most fundamentally, there was no adversity and, accordingly, no subject matter jurisdiction over Trump's claims.  A sitting President may not obtain relief on claims against the executive-branch agencies he directs and controls, and a court may not exercise jurisdiction over such claims.

65.     Trump himself acknowledged this problem on several occasions. Days after the suit was filed, he told reporters that he was "supposed to work out a settlement with myself." Days later, when asked what he would like to say about the case to the Treasury Secretary and the Attorney General, Trump quipped, "tell 'em to pay me," although he then added "I'll give 100% of the money to charity."

66.     The lack of adversity was plain to see. But it was far from the only problem.

13

67.     The *Trump* plaintiffs' claims were also time-barred. Trump's personal lawyer appeared at Littlejohn's October 2023 plea hearing "on behalf of President Trump" and identified Trump as a victim. Tr. of Oct. 12, 2023, Plea Hr'g at 14:22–16:24, *United States v. Littlejohn*, No. 1:23-cr-00343 (Oct. 23, 2023), ECF No. 13. Trump had actual knowledge of Littlejohn's conduct no later than that date (and almost certainly months or years earlier). Accordingly, the *Trump* plaintiffs' deadline to file their two claims expired, at the latest, two years after that hearing, in October 2025. Yet their lawsuit was not filed until three months after that.

68.     And the *Trump* plaintiffs' improbable assertion of $10 billion in damages was inadequately pleaded. As noted, § 7431 caps damages at $1,000 per disclosure unless actual damages exceed that number. The Privacy Act likewise requires proof of actual damages. Yet the *Trump* plaintiffs did not plead actual damages with any specificity: the $10 billion figure was alleged in a single sentence, and was entirely unexplained. The figure lacked any justification or plausibility.

## VI.     Faced with imminent dismissal of Trump's frivolous lawsuit, Defendants rushed to settle.

69.     Recognizing the obvious problems with a sitting President's attempting to litigate against agencies under his supervision and control, the court *sua sponte* ordered the parties and court-appointed *amici* to brief whether the case satisfied Article III. Order, *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. Apr. 24, 2026), ECF No. 41; Order, *id.* (Apr. 29, 2026), ECF No. 43.

70.     *Amici* filed a comprehensive brief putting the adversity question beyond any doubt. Memorandum of Court-Appointed Amici Curiae, *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. May 14, 2026), ECF No. 45.

71.     *Amici* explained that under the Supreme Court's "functional test" for adversity, adversity is absent when one party "controls the conduct of litigation on both sides." *Id.* at 11.

14

*Amici* then exhaustively detailed the President's "extraordinary" "capacity for control" over the Attorney General, Treasury Secretary, and IRS. *Id.* at 16–21. *Amici* also documented Trump's own repeated concessions that he was "supposed to work out a settlement" with himself, along with the overwhelming other evidence of actual control. *Id.* at 18.

72.    DOJ's brief addressing adversity was due on May 20, 2026. But that brief was never filed. In fact, DOJ never even entered appearances in the case.

73.    Instead, on May 18, 2026, DOJ announced that it and the Treasury Department had settled the case. Ex. 3; *see also* Exs. 1, 2.[2]

74.    Plaintiffs then filed a notice of voluntary dismissal. *See* Plaintiffs' Notice of Voluntary Dismissal with Prejudice Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i), *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. May 18, 2026), ECF No. 52.

75.    That same day, the court entered an order closing the case. Order, *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. May 18, 2026), ECF No. 62.

## VII.    Defendants purported to create and fund the Anti-Weaponization Fund as part of the settlement.

76.    Using the vehicle of the *Trump v. IRS* settlement, Defendants purport to have created, funded, and assigned duties to an entity they refer to as the "Anti-Weaponization Fund."

77.    The Anti-Weaponization Fund is a five-member commission, with members appointed by the Attorney General but subject to removal at will by the President. Ex. 2 at 2.

78.    The Anti-Weaponization Fund is funded by a $1.776 billion payment from the Judgment Fund. Ex. 1 ¶ C.

---

[2] According to the Settlement Agreement, the settlement also resolved two Federal Tort Claims Act claims that Trump had previously filed against DOJ based on "the unlawful raid on Mar-a-Lago" and "the Russia-collusion hoax." Ex. 2 at 1.

79. The Anti-Weaponization Fund has the authority to pay claims to purported "victim[s] of Lawfare and/or Weaponization." Ex. 2 at 3.

80. To apply for recovery from the Fund, a claimant "must assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization." *Id.*

81. The Fund must consider prescribed factors to assess each such claim. Notably, these factors include "attorneys' fees paid by the claimant as a result of the Lawfare and Weaponization" and "[a]ny time the claimant spent in prison or otherwise in federal prison [*sic*] or custody as a result of the Lawfare and Weaponization." *Id.* at 4.

82. According to the Settlement Agreement, Anti-Weaponization Fund payments will not be subject to judicial review. *Id.*

83. According to the Settlement Agreement, the identity of claimants and amount of compensation paid by the Fund will not be made public. *Id.* at 3.

84. The Settlement Agreement provides that Trump and the other *Trump v. IRS* plaintiffs will receive a formal apology but no monetary compensation from the Fund or otherwise. *Id.* at 1.

85. An addendum to the Settlement Agreement released by DOJ on May 19 furnishes the *Trump* plaintiffs with a sweeping liability waiver which, notably, appears to foreclose IRS audits. Addendum to Settlement Agreement, *Trump v. IRS*, No. 1:26-cv-20609 (May 19, 2026) (Ex. 4).

**VIII.    The Anti-Weaponization Fund will be used to compensate January 6 rioters.**

86. The Anti-Weaponization Fund will be used to pay January 6 rioters in general, and the Proud Boys in particular.

87. President Trump initially floated the idea of paying the January 6 rioters in March 2025, saying that "[a] lot of the people that are in the government now talk about" compensating

rioters "because a lot of the people in government really like that group of people." Trump made clear that he was one such person, declaring the rioters "patriots" who were "treated very unfairly."

88.     Trump administration officials similarly supported paying the rioters. For instance, Ed Martin, the head of the Justice Department's Weaponization Working Group at the time, said that he supported "reparations" for January 6 defendants.

89.     Administration officials have not changed their tune since the Fund was announced. For instance, in testimony to a Senate subcommittee on May 19, Blanche was asked whether he would commit to not making payments to Proud Boys and others convicted of January 6 crimes. Tellingly, Blanche dissembled, indicating that the question was "for the commissioners." But Blanche, whose job security depends on pleasing the President, has authority to appoint each of the five commissioners. Ex. 2 at 2. And the President—whose views are quite clear—has the power to remove commissioners for any reason. *Id.*

90.     Vice President JD Vance similarly has declined to commit to withholding Fund payments from rioters, including those who assaulted police officers. At a press conference on May 19, Vance was asked if "people who attacked the Capitol building and assaulted police officers . . . should they receive money from this fund?" Vance replied that "the people that would get the money are people, some of whom have been prosecuted completely disproportionate to any crime they've ever committed." As an example, Vance cited Tina Peters, an election denier who was imprisoned for helping to hack into Colorado's election systems.

91.     When pressed to answer the question he had actually been asked, Vance responded: "We do have people who are accused of attacking law enforcement officers. That doesn't mean that we're going to completely ignore some of the claims that they're going to make." Vance thus twice declined to rule out payments even to January 6 rioters who assaulted police.

17

92.    In this context, and in light of Administration officials' statements, the purpose of the Anti-Weaponization Fund is obvious: to provide the January 6 rioters, including the Proud Boys, with the remuneration they, the President, and the President's allies all agree they are owed.

93.    And the rioters themselves supported getting paid. At least eight January 6 defendants have sought refunds of restitution or fines paid as part of their convictions. Hundreds more have filed claims against the Department of Justice and FBI seeking money for alleged property damage and personal injury. The Proud Boys were the most ambitious, seeking $100 million in damages for alleged harms resulting from what they termed their "political persecution."

## IX.    The Anti-Weaponization Fund is inflicting and will continue to inflict cognizable injuries on Plaintiffs.

94.    By creating the Anti-Weaponization Fund, funding it, and authorizing claim criteria that will allow it to make payments to, among others, Proud Boys and January 6 rioters, Defendants have inflicted concrete and cognizable harms on Plaintiffs Dunn and Hodges.

95.    The Fund's mere existence sends a clear and chilling message: those who enact violence in President Trump's name will not just avoid punishment, they will be rewarded with riches. That message, by itself, substantially increases the already sizeable risk of vigilante violence Dunn and Hodges face on a near-daily basis. And it encourages those who are harassing Dunn and Hodges, and sending them death threats, to up the ante.

96.    These concrete, imminent injuries, which Defendants have caused, give Plaintiffs standing.

97.    And if and when the Fund begins making payments, Plaintiffs' injuries will compound. In particular, if the rioters who have already accosted Plaintiffs *in person* on several occasions receive even a fraction of the $1.7 billion, the danger to Plaintiffs is enormous.

98.     Payments from the Fund will be used to finance the operations of those who have threatened and tried to kill Plaintiffs. The rioters and paramilitaries who tried to kill Dunn and Hodges on January 6, and who continue to threaten them today, need money for their operations. The January 6 rioters had caches of guns, pepper and bear spray, body armor, tactical gear, and communications equipment. Such sophisticated equipment is expensive to obtain and maintain.

99.     Accordingly, many rioters, including members of paramilitary groups, fundraised for their operations before and after January 6, and continue to do so today. Crowdfunding by rioters and their supporters since January 6 has raised at least $5.3 million. And Oath Keepers founder Stewart Rhodes received donations as recently as May 16, 2026. The Fund will make render such fundraising far easier, supplementing online crowdfunding with public financing out of a confidential $1.7 billion slush fund.

100.     Earlier this year, on the fifth anniversary of January 6, Enrique Tarrio said that "[t]he thing that I'm searching for is retribution, retaliation." After briefly disclaiming violence, Tarrio added, "I want them to pay. They made an example out of us, and we need to make an example out of them."

101.     Compensating rioters like Tarrio through the Anti-Weaponization Fund will encourage them to seek that retribution, and furnish them with the resources to bring it about.

### COUNT I – CREATION OF ANTI-WEAPONIZATION FUND
**Administrative Procedures Act**
5 U.S.C. §§ 702, 704, 706(2)(C)
*Against Defendant Blanche*

102.     Plaintiffs incorporate all allegations set forth above and below as though set forth in this paragraph.

103.     The Department of Justice is an "agency" within the meaning of 5 U.S.C. § 551(1).

104.    DOJ's action establishing the Anti-Weaponization Fund constitutes final agency action subject to judicial review under 5 U.S.C. §§ 702, 704, and 706.

105.    That action was "in excess of statutory jurisdiction, authority, or limitations" within the meaning of 5 U.S.C. § 706(2)(C).

106.    DOJ has in effect created a new federal agency with the authority to compromise a new, never-before-recognized federal-law claim for "weaponization" and "lawfare."

107.    No statute authorizes DOJ to create the so-called Anti-Weaponization Fund.

108.    No statute authorizes DOJ to establish the five-member commission it purports to have established to administer that Fund.

109.    No statute authorizes the Attorney General to appoint members to that commission.

110.    No statute authorizes DOJ to confer on the President the right to remove members from that commission at will.

111.    No statute authorizes DOJ to recognize new federal-law claims, nor does any existing statute render actionable a claim against federal officials or instrumentalities for "weaponization" or "lawfare."

112.    And no statute authorizes DOJ, by means of a commission, to transfer federal money to weaponization claimants.

113.    DOJ purports to rely on 31 U.S.C. § 1304 and 28 U.S.C. § 2414 to ground its actions, Ex. 1 ¶ G, but neither of those statutes provides the necessary authority.

114.    The Judgment Fund, 31 U.S.C. § 1304, is an appropriation statute; it simply appropriates to DOJ the monies necessary to satisfy judgments against the United States and to settle certain claims. It does not allocate any substantive authority to DOJ.

115.    And 28 U.S.C. § 2414 in turn simply authorizes DOJ to use the monies in the Judgment Fund to satisfy judgments and settle claims rendered cognizable by substantive federal law.

116.    28 U.S.C. § 2414 does not empower DOJ or the Attorney General to create new commissions, appoint their members, or recognize new substantive rights or claims.

117.    Because it was not authorized by any statute, DOJ's action creating the Anti-Weaponization Fund was "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(C).

118.    DOJ's brazen aggrandizement of its authority also has a constitutional dimension.

119.    It falls to Congress, not executive branch agencies, to create new agencies, determine their structure, and provide for their funding.

120.    And it falls to Congress, not executive branch agencies, to establish substantive rights, render violations of those rights cognizable under federal law, and determine where damages or other forms of compensation may be available as a remedy.

121.    DOJ's action creating the Anti-Weaponization Fund arrogates these core legislative powers to the executive branch.

122.    DOJ's unlawful action creating the Fund has harmed Plaintiffs Dunn and Hodges as set forth above, and Plaintiffs have no remedy at law other than an APA claim.

123.    Accordingly, Plaintiffs Dunn and Hodges are entitled to a court order holding unlawful and setting aside DOJ's creation of the Anti-Weaponization Fund.

**COUNT II – FUNDING OF ANTI-WEAPONIZATION FUND**
**Administrative Procedures Act**
5 U.S.C. §§ 702, 704, 706(2)(A), (C)
*Against Defendants Blanche and Bessent*

124.    Plaintiffs incorporate all allegations set forth above and below as though set forth in this paragraph.

21

125. The Departments of Justice and of the Treasury are "agenc[ies]" within the meaning of 5 U.S.C. § 551(1).

126. DOJ's and Treasury's actions certifying payment of $1.776 billion from the Judgment Fund to the Anti-Weaponization Fund constitute final agency actions subject to judicial review under 5 U.S.C. §§ 702, 704, and 706.

127. DOJ's and Treasury's actions certifying payment to the Anti-Weaponization Fund were "in excess of statutory jurisdiction, authority, or limitations" within the meaning of 5 U.S.C. § 706(2)(C).

128. DOJ and Treasury purport to have certified that payment under their statutory authority to settle *Trump v. IRS*.

129. But DOJ's and Treasury's authority to compromise claims against the United States by drawing on the Judgment Fund is bounded by statute.

130. Specifically, the Judgment Fund, 31 U.S.C. § 1304, appropriates monies to settle claims only where (i) the payment is not otherwise provided for by statute; (ii) the payment is certified by the Secretary of the Treasury; and (iii) the settlement is payable under 28 U.S.C. § 2414 (or one of several more specific statutes not implicated here).

131. Under 28 U.S.C. § 2414, in turn, DOJ's settlement authority reaches only "settlements of claims . . . for defense of imminent litigation or suits against the United States, or against its agencies or officials upon obligations or liabilities of the United States."

132. Similarly, under 31 C.F.R. § 256.1, Treasury's authority to certify settlement payments reaches only "settlement of claims arising under actual or imminent litigation."

133. The Government Accountability Office understands these provisions to require a "genuine disagreement or impasse" and "a legitimate dispute over either liability or amount." U.S.

Gov't Accountability Off., GAO-08-978SP, 3 Principles of Federal Appropriations Law 14-35 (3d ed. 2008).

134.    The Office of Legal Counsel concurs: it has concluded that a settlement is "payable from the Judgment Fund" if, *but only if*, the "underlying 'cause[]' of a settlement could have led to a money judgment, had no settlement been reached." Availability of Judgment Fund in Cases Not Involving a Money Judgment Claim, 13 Op. OLC 98, 103 (1989).

135.    The *Trump v. IRS* litigation did not meet these standards. To the contrary, it was a Potemkin lawsuit, a sham brought about only so that it could be settled.

136.    Blanche was well aware of the case's fatal jurisdictional defect—that is why he agreed to a multi-billion-dollar settlement just before DOJ's deadline to brief adversity, without any DOJ attorney even entering an appearance in the case.

137.    Put simply, the sitting President cannot obtain relief on claims against his own executive branch. No court could ever exercise subject matter jurisdiction over such an absurdity.

138.    It follows that such claims do not constitute "actual or imminent litigation," cannot give rise to any "legitimate dispute over either liability or amount," cannot result in "obligations or liabilities" being imposed on the United States, could not cause a court to enter "a money judgment, had no settlement been reached," and so cannot be settled out of the Judgment Fund.

139.    Accordingly, DOJ and Treasury acted "in excess" of their "statutory jurisdiction [and] authority," within the meaning of 5 U.S.C. § 706(2)(C), by certifying such a settlement.

140.    That action, which funded the Anti-Weaponization Fund, must be held unlawful and set aside.

141.    Further, Defendant Blanche's actions to fund the Anti-Weaponization Fund violated the APA in a second sense.

23

142.   As noted, 28 U.S.C. § 2414 authorizes a settlement payment only where the Attorney General certifies that such payment "is in the interest of the United States."

143.   Blanche's May 18 letter, Ex. 1, constituted such a certification.

144.   That certification was "arbitrary, capricious, [and] an abuse of discretion" within the meaning of 5 U.S.C. § 706(2)(A).

145.   The payment of $1.776 billion into the Anti-Weaponization Fund to settle *Trump v. IRS* was patently not "in the interest of the United States." Rather, it was a misappropriation of taxpayer funds orchestrated by the President to reward his allies and the rioters who committed violence in his name.

146.   In certifying otherwise, Blanche abused his discretion in at least five ways.

147.   First, Blanche certified settling a case with zero legal merit that, absent settlement, was all but certain to be dismissed for lack of jurisdiction.

148.   Second, Blanche certified such a settlement without testing the strength of the plaintiffs' claims in any fashion.

149.   Third, Blanche certified settling such a case for an extraordinary sum—nearly $2 billion—that has no plausible basis in the strength of the actual claims. Indeed, Blanche himself conceded that the settlement amount did "not represent the value of any claim" in *Trump v. IRS* but rather was "based on the projected valuation of future claimants' claims." Ex. 1 ¶ C.

150.   Fourth, even by its terms, Blanche's valuation of the settlement was irrational, because the "value" of future weaponization claimants' claims is zero dollars—no such claim exists.

151.    Fifth, Blanche certified the settlement even though he knew the lawsuit to be a sham contrived by his boss, President Trump, to extract taxpayer money from the Treasury and redirect it to his supporters and allies.

152.    These deficiencies rendered Blanche's certification arbitrary, capricious, and an abuse of discretion.

153.    Defendants' unlawful actions have harmed Plaintiffs Dunn and Hodges as set forth above, and Plaintiffs have no remedy at law other than an APA claim.

154.    Plaintiffs Dunn and Hodges are entitled to a court order holding unlawful and setting aside Defendants' actions funding the Anti-Weaponization Fund.

**COUNT III – ASSUMING OBLIGATIONS AND DEBTS OF INSURRECTIONISTS**
**Administrative Procedures Act**
5 U.S.C. §§ 702, 704, 706(2)(B) & Fourteenth Amendment
*Against Defendant Blanche*

155.    Plaintiffs incorporate all allegations set forth above and below as though set forth in this paragraph.

156.    The Department of Justice is an "agency" within the meaning of 5 U.S.C. § 551(1).

157.    DOJ's action empowering the Anti-Weaponization Fund to compensate claims of "lawfare and "weaponization" constitutes final agency action subject to judicial review under 5 U.S.C. §§ 702, 704, and 706.

158.    DOJ's action establishing the Anti-Weaponization Fund was "contrary to constitutional right, power, privilege, or immunity" within the meaning of 5 U.S.C. § 706(2)(B).

159.    Specifically, DOJ's action violated an express prohibition of the Fourteenth Amendment.

160.    Under section 4, clause 2 of that Amendment, "neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States."

161.    DOJ has authorized the Anti-Weaponization Fund to make payment of monies from the United States Treasury to the January 6 rioters.

162.    Those rioters engaged in an act of "insurrection . . . against the United States" by attacking the Capitol in an attempt to prevent the lawful certification of a presidential election.

163.    As a consequence of that conduct, many insurrectionists incurred sizeable debts and other financial obligations—in particular, legal fees incurred defending against criminal charges and, for the many convicted, restitution obligations.

164.    DOJ has now committed the United States to paying those debts and obligations.

165.    The *Trump v. IRS* settlement agreement specifically mandates that the Anti-Weaponization commission "shall consider" each claimant's "actual damages incurred as a result of the Lawfare and Weaponization," including specifically any "attorneys' fees paid by the claimant as a result of the Lawfare and Weaponization." Ex. 2 at 3–4.

166.    By committing the United States to base compensation decisions on those factors, DOJ has violated the Fourteenth Amendment and, in turn, 5 U.S.C. § 706(2)(B).

167.    DOJ's unconstitutional actions have harmed Dunn and Hodges as set forth above, and Plaintiffs have no remedy at law other than an APA claim.

168.    Dunn and Hodges are entitled to a court order holding unlawful and setting aside DOJ's unconstitutional assumption of insurrectionist debts and obligations.

**COUNT IV – ALTERNATIVE COUNT**
***Ultra Vires* Agency Action**
*Against Defendants Blanche and Bessent*

169.    Plaintiffs incorporate all allegations set forth above or below as though set forth in this paragraph.

170.    Plaintiffs have a non-statutory right of action to seek injunctive and declaratory relief from agency actions that are *ultra vires*.

171.    As set forth above, Blanche's and Bessent's actions establishing the Anti-Weaponization Fund, funding it through the *Trump v. IRS* settlement, and authorizing it to pay the debts and obligations of insurrectionists were unlawful and unconstitutional, and thus *ultra vires*.

172.    Defendants' *ultra vires* actions have harmed Dunn and Hodges as set forth above.

173.    Insofar as the APA provides no or an inadequate remedy for the resulting injuries, Dunn and Hodges are entitled to equitable and declaratory relief from such injuries under the *ultra vires* doctrine.

**COUNT V – DECLARATORY JUDGMENT**
**Federal Declaratory Judgment Act**
28 U.S.C. §§ 2201–02
*Against All Defendants*

174.    Plaintiffs incorporate all allegations set forth above and below as though set forth in this paragraph.

175.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

176.    As set forth above, Defendants have acted in excess of their statutory authorities and in violation of the U.S. Constitution.

177.   Defendants Blanche and Bessent have taken their illegal actions at the direction of Defendant Trump.

178.   Through their actions, Defendants have harmed Plaintiffs Dunn and Hodges.

179.   Dunn and Hodges are entitled to a judgment declaring Defendants' conduct unlawful and unconstitutional.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court grant the following relief:

A.   An order under 5 U.S.C. § 706 holding unlawful and setting aside Defendant Blanche's action creating the Anti-Weaponization Fund;

B.   An order under 5 U.S.C. § 706 holding unlawful and setting aside Defendant Blanche's and Defendant Bessent's actions certifying payment of $1.776 billion from the Judgment Fund to the Anti-Weaponization Fund;

C.   An order under 5 U.S.C. § 706 holding unlawful and setting aside Defendant Blanche's action authorizing the Fund to assume the debts and obligations of insurrectionists on behalf of the United States;

D.   Insofar as any transfer of funds from the Judgment Fund to the Anti-Weaponization Fund has already occurred, an order enjoining Defendants to reverse that transfer;

E.   An order enjoining Defendants from making payments out of the Anti-Weaponization Fund to any claimant;

F.   An order declaring Defendants' conduct unlawful, in excess of statutory jurisdiction and authority, and unconstitutional;

G.   An award of Plaintiffs' costs and reasonable attorneys' fees; and

H.   Such other and further relief as the Court deems just and proper.

Plaintiffs demand a jury trial.

28

Dated: May 20, 2026

Respectfully submitted,

/s/ Samuel T. Ward-Packard

**PUBLIC INTEGRITY PROJECT**
Brendan Ballou
D.C. Bar No. 241592
Samuel T. Ward-Packard
D.C. Bar No. 90005484
brendan@publicintegrityproject.org
sam@publicintegrityproject.org

*Attorneys for Plaintiffs Harry Dunn and Daniel Hodges*