**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **HARRY DUNN**, *et al.*, | § | |
| | § | Civil Action No. 26-1719 (RJL) |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| **DONALD J. TRUMP**, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**DECLARATION OF KEVIN TRUDEAU**

I, Kevin Trudeau, declare as follows:

1.  My legal name is Kevin Trudeau.

2.  I am an adult of sound mind.

3.  I make this declaration in support of my motion to intervene as a defendant in this action. The facts stated below are based on my personal knowledge or my reasonable belief, and if called to testify I could and would testify competently to them.

4.  I am seeking to intervene in this action, Civil Action No. 1:26-cv-01719-RJL, so that I may protect my interest in, and my right to seek payment from, the Anti-Weaponization Fund (the "Fund").

5.  I am a globally recognized author of number-one *New York Times* bestselling books on natural health, personal development, and entrepreneurship. I have sold tens of millions of books, including one of the best-selling natural-health books of all time, *Natural Cures They Don't Want You To Know About*.

6. From 1989 to 2012, I reached tens of millions of people each week on television and radio. Many of the views I expressed during those years—including my warnings about certain artificial sweeteners, food dyes, prescription opioids, fluoride in drinking water, and ultra-processed foods—are today mainstream components of the movement known as Make America Healthy Again.

7. I believe that because I had so large an audience, and because my message implicated the interests of powerful corporations and government agencies, I was targeted by the federal government for the views expressed in my books. During the Obama Administration, it is my understanding and belief that the Department of Justice, the Food and Drug Administration, and the Federal Trade Commission worked together to silence me and to stop me from exercising my First Amendment right to free speech.

8. The government brought civil charges against me alleging that I had made unsubstantiated statements in my television and radio appearances. Those cases were resolved through negotiated settlements, styled as consent decrees, that included no finding of wrongdoing. Among other things, the settlements operated as effective media bans. In addition, government agencies contacted media outlets encouraging them to stop running my TV shows.

9. When I appeared on television and read directly from one of my own books during an infomercial, the Federal Trade Commission accused me of violating a consent decree by allegedly misrepresenting the contents of my own book, thus charging me with civil contempt of court. The court denied me the ability to raise the First Amendment, or my reliance on the advice of counsel, as a defense. I was convicted of criminal contempt of court and sentenced to ten years in prison.

10. My sentencing judge imposed that ten-year sentence even though a predecessor judge had stated an expectation that my sentence would be at most six months. The sentencing judge explained that the sentence was imposed in part because I had "so publicly stated [my] case" for the views expressed in the books I sold. ECF No. 204 at 85:17-18, *United States v. Trudeau*, No. 1:10-cr-886 (N.D. Ill.); *see also* ECF No. 166 at 39 n.14.

11. In decades of litigation, no prosecutor produced a single witness who claimed to have actually been misled by my television infomercials, my interviews, my books, or my radio or television programs.

12. I am informed and believe that the ten-year sentence I received is the longest contempt sentence ever handed down in the Seventh Circuit and one of the longest ever issued in the United States by any court.

13. No restitution was ordered in my criminal contempt case, and no fine was imposed. There were no victims of my conduct other than me.

14. I lost a great deal as a result of the government's actions. I was billed more than $10,000,000 in legal fees defending myself. I served a ten-year prison sentence. The court appointed a receiver who took control of all of my companies and assets, which were worth hundreds of millions of dollars. After collecting more than $4,000,000 in fees, the receiver liquidated my businesses for a small fraction of their value, and I was left with nothing.

15. The financial harm extended well beyond the fees I paid and the businesses I lost. Before the government's actions, my businesses were generating hundreds of millions of dollars in sales. I strongly believe that I lost as much as $2 billion in potential revenue during the years I spent incarcerated and barred from my work.

16. The harm to my reputation has been lasting. To this day, when someone searches my name online, the government's accusations against me appear without the facts that would place them in context.

17. I endured the stress and anxiety of fighting the federal government for nearly thirty years over conduct that, in my view, amounted to nothing more than expressing opinions that powerful interests did not want expressed.

18. It is my position that I was prosecuted and punished for engaging in activity protected by the First Amendment: expressing controversial views in books and broadcasts that reached a large audience. I understand the Fund to have been created to compensate people who, like me, were targeted by the government for political or ideological reasons, and I believe my experience is precisely the kind of targeting the Fund was established to redress.

19. I had no involvement of any kind in the events at the United States Capitol on January 6, 2021. I am one of many ordinary Americans whom the Fund was designed to compensate for government overreach unrelated to those events.

20. In August 2025, I sought and received early termination of the conditions of supervised release that had restrained me following my contempt conviction. That same month, I applied to President Donald J. Trump for a pardon because I am 100% innocent of any wrongdoing.

21. On May 22, 2026, my counsel submitted a formal written claim on my behalf to the Anti-Weaponization Fund, seeking payment of $10,000,000. Even $100,000,000 would be only a fraction of the direct financial losses I have incurred, not including the pain and suffering of the politically motivated actions against me and the loss of nearly 10 years of my life in prison. That

claim was delivered to the Office of the Attorney General on May 27, 2026. I intend to pursue my claim through any formal application process the Fund may establish.

22. My ability to obtain payment depends entirely on the continued existence of the Fund. I understand that the Plaintiffs in this action are asking the Court to dissolve the Fund, to reverse the payment that finances it, and to prohibit the Fund from making any payment to any claimant. If the Plaintiffs succeed, my claim will be worthless, because there will be no Fund from which I can be paid.

23. I understand that the Fund holds a fixed amount of money, that it will stop accepting claims in 2028, and that it may receive claims from millions of people. Because of the gravity of what I suffered, including the decade I spent in prison and the many years of government restrictions before that, I am seeking a recovery larger than an equal, per-person share of the Fund.

24. I am concerned that the federal government will not adequately protect my particular interest in this case. As I understand it, the government's interest is in defending the Fund's general validity. My interest is different and more specific: I need the Fund not only to survive, but to remain able to pay a claim as substantial as mine. I do not believe the government will have the incentive in this litigation to represent that specific interest of mine, and I want to be able to represent it myself.

25. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 1, 2026.

/s/ Kevin Trudeau
Kevin Trudeau