## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **HARRY DUNN & DANIEL HODGES,**<br><br>　　　Plaintiffs,<br><br>v.<br><br>**DONALD J. TRUMP**, in his official capacity as President of the United States, **TODD BLANCHE**, in his official capacity as Acting Attorney General of the United States, and **SCOTT BESSENT**, in his official capacity as Secretary of the Treasury of the United States,<br><br>　　　Defendants. | Case No. 1:26-cv-1719-RJL |

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

## TABLE OF CONTENTS

Introduction....................................................................................................................1

Background.....................................................................................................................4

Legal Standard ..............................................................................................................9

Argument ....................................................................................................................10

    I.       PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE ....................................................10

    A.  Plaintiffs' Claims Are Not Ripe For Adjudication ...............................................10

    B.  This Case Is Moot ................................................................................................13

    C.  Plaintiffs Lacks Standing .....................................................................................14

    II.      PLAINTIFFS FAIL TO PLEAD ANY COGNIZABLE CAUSE OF ACTION..........17

    A.  Plaintiffs' APA Claims Must Fail Because There Has Been No Final Agency Action......18

    B.  Plaintiffs Ultra Vires and Declaratory Judgment Claims Fail...........................................20

Conclusion ..................................................................................................................21

**INTRODUCTION**

Defendants respectfully move this Court to dismiss this case pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) because Plaintiffs cannot establish subject-matter jurisdiction and, in any event, fail to state a claim upon which relief can be granted. This dispute concerns an Anti-Weaponization Fund ("Fund") that has never been set up and is not going forward. As such, Plaintiffs' claims are not justiciable and ought to be dismissed.

Federal courts may resolve "active political debate[s] . . . only if necessary to do so in the course of deciding an actual 'case' or 'controversy'" as those words are "used in the Constitution." *Hollingsworth v. Perry*, 570 U.S. 693, 697, 700 (2013). Article III of the Constitution is thus "an essential limit" on judicial power. *Id.* at 700. "It ensures that [courts] act as *judges*, and do not engage in policymaking properly left to elected representatives." *Id.* at 700. That remains true even when there is a high-profile "controversy" in the *non*-Article III sense. *Id.* After all, "[f]ederal courts are not roving commissions licensed to sally forth each day looking for wrongs to right." *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026) (internal quotation marks and citations omitted). Opining on abstract issues is even more inappropriate where challengers have already received "the precise relief that [they] requested," rendering a case "moot." *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 338–39 (2020). Those principles control here. The United States thus moves to dismiss this civil action on justiciability (and other) grounds—not because the Fund will continue (it will not)—but to protect the Executive's institutional interests in the proper application of Article III limitations on judicial review.

On May 18, 2026, the Department of Justice announced through a Settlement Agreement the establishment of "The Anti-Weaponization Fund," which would provide a systematic process to hear and redress certain claims alleging use of the levers of government power to target

1

individuals, groups, and entities for improper and unlawful reasons. ECF No. 1-2. The Acting Attorney General issued a corresponding order the same day. ECF No. 1-1. The Settlement Agreement and order garnered significant attention and provoked widespread debate about the weaponization of government, whether and how any claims process should function, and past settlements reached by other administrations. But when Plaintiffs filed this case—and indeed to date—no money has been transferred to the Fund, let alone any potential claimant. No mechanisms were in place for formally submitting, receiving, processing, granting, or denying claims. Indeed, none of the five contemplated "Members" who would establish and administer such procedures for the Fund have even been appointed. And after Plaintiffs filed this case, the political process continued to play out. On June 2, 2026, the Acting Attorney General told Congress that although "the reasons for the Fund remain important," the Fund is "not going forward, period." House Appropriations Committee, Oversight Hearing – Department of Justice, at 40:30-42:50 ("House Oversight Hearing"). Based on those comments, along with the briefs and representations of counsel for the government, this Court denied an application for a Temporary Restraining Order and a motion for a Preliminary Injunction in a related matter. *See Citizens for Resp. and Ethics in Wash. v. Dep't of Justice*, Case No. 1:26-cv-1789 ("*CREW*"), Doc. 20–21 (D.D.C. June 23, 2026) (denying a motion for Preliminary Injunction for lack of subject matter jurisdiction); Minute Entry, *Citizens for Resp. and Ethics in Wash. v. Dep't of Justice*, Case No. 1:26-cv-1789 (D.D.C. June 10, 2026) (denying motion for Temporary Restraining Order).

Subsequent events underscore even further that the Fund will not move forward, reaffirming this Court's mootness analysis in the *CREW* matter. On July 15, 2026, Acting Attorney General Blanche testified, under oath, at his Senate Confirmation hearing on the Fund "is a moot issue, meaning there is no weaponization fund. The weaponization fund is dead, it's not moving

forward." Senate Judiciary Committee, Nomination Hearing of the Honorable Tood Blanche to be Attorney General of the United States ("Nomination Hearing"), at 1:26:42–:49. When pressed further, he emphasized, "the settlement fund is just not moving forward there's no modification it's just it never started no money went from the Treasury to any other account there's no commissioners it's not moving forward." *Id.* at 1:27:12–:22. Later in the same hearing, he reiterated, "I'm under oath today, and I've said it's dead repeatedly." *Id.* at 2:30:44-:53.

In addition to Plaintiffs' claims being not justiciable, Plaintiffs lack standing to bring the claims they assert. Plaintiffs cannot show any "injury in fact that is concrete, particularized, and actual or imminent," let alone an injury that "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Because courts are not "general complaint bureaus," a "federal taxpayer" does not have standing just because the taxpayer thinks that a "federal expenditure" is unlawful. *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 593 (2007). Yet those are the exact claims Plaintiffs offer here: generalized grievances about a planned government action with which they have a policy disagreement.

Plaintiffs' primary case theory appears to be that the Settlement Agreement was in excess of statutory authority. ECF No. 1 at ¶ 105. The harm, Plaintiffs claim, is that the establishment of the Anti-Weaponization Fund will provoke third parties to engage in hostile, violent, or even criminal actions against them. *Id.* at ¶¶ 94–101. The problem, for the Plaintiffs, is that the "comfort and joy" of a favorable judgment because they believe "the United States Treasury is not cheated … or that the Nation's laws are faithfully enforced" is "not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). And the idea that *future* relief from the fund could somehow *indirectly* finance or incentivize *future* criminal activity due to the *future* choices of third parties is the precise

3

type of "unadorned speculation" that cannot establish standing. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976). Plus, courts should never "presume illegal activities on the part of actors not before the[m]." *Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 48 (D.C. Cir. 1994).

Because mootness, standing, and ripeness are all fatal to Plaintiffs' motion, there is no need to reach the merits of Plaintiffs' claims. But to be clear, Plaintiffs also fail to plead claims for which relief can be granted. Plaintiffs' Administrative Procedure Act ("APA") claims fail to allege any final agency action, among other defects. The Court should dismiss Plaintiffs' claims.

## BACKGROUND

In anticipation of the 2020 election, Charles Littlejohn obtained a job as an IRS contractor with the goal of leaking President Donald J. Trump's tax data. Littlejohn leaked President Trump's tax returns (and the tax data of his sons Donald J. Trump, Jr. and Eric Trump, as well as the Trump Organization, LLC) to the New York Times in 2019, and the New York times published stories about the returns starting in September 2020. Littlejohn separately stole tax data for thousands of wealthy individuals and shared that information with another media company.

Under 26 U.S.C. § 7213(a)(1), the unauthorized disclosure of tax return information is a felony. Littlejohn was eventually caught, convicted, and sentenced to the maximum five years in prison. *See* Judgment at 35, *United States v. Littlejohn*, 1:23-cr-343 (D.D.C.) (Jan. 31, 2024) (sentencing Defendant to "Sixty (60) Months" of incarceration), *aff'd* Case No. 24-3019, 2026 WL 2065951 (D.C. Cir., July 17, 2026); *see also* U.S. Department of Justice, *Former IRS Contractor Sentenced for Disclosing Tax Return Information to News Organizations* (Jan. 29, 2024) *available at* https://www.justice.gov/archives/opa/pr/former-irs-contractor-sentenced-disclosing-tax-return-information-news-organizations.

The federal tax code also provides a right of action for taxpayers whose returns have been leaked to bring a civil action for damages against the United States. 26 U.S.C. § 7431(a)(1). And

under the federal Privacy Act, when an agency fails to "establish appropriate . . . safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained," an injured individual "may bring a civil action against the agency." 5 U.S.C. § 552a(e)(10), (g)(1).

In 2022, another victim of Littlejohn's leak sued the United States in the Southern District of Florida and invoked these provisions. *See Griffin v. IRS*, 1:22-cv-24023 (S.D. Fla.). The United States unsuccessfully moved to dismiss the tax code claim on the ground that Littlejohn was not technically an employee of the United States (despite his contractor label). *See Griffin*, ECF No. 108 at 4–7. The court contemplated summary judgment proceedings, and potentially a trial, on that question. *See id.* at 10. Although the court held that the victim did not adequately allege damages under the Privacy Act, the court appeared to assume that the Privacy Act would otherwise apply. *See id.* at 9–10. Ultimately, the victim settled with the United States for a formal apology.[1]

On January 29, 2026, President Trump, Donald J. Trump, Jr., Eric Trump, and The Trump Organization, LLC filed a complaint in the U.S. District Court for the Southern District of Florida. *See* Complaint at 1, *President Donald J. Trump, et al. v. Internal Revenue Serv.*, 1:26-cv-20609 (Jan. 29, 2026). They asserted claims under 26 U.S.C. § 6103, 26 U.S.C. § 7431, and 5 U.S.C. § 552(a)(e)(10). *See id.* In the Settlement Agreement counsel for Plaintiffs indicated that they intended to amend their complaint to add a putative class claim. ECF No. 1-2 at 1. President Trump had also submitted Federal Tort Claims Act (FTCA) administrative claims for relief alleging an

---

[1] *The IRS Apologizes to Ken Griffin*, WALL STREET JOURNAL (June 26, 2024), *available at* https://www.wsj.com/opinion/the-irs-apologizes-to-ken-griffin-citadel-taxdata-charles-littlejohn-propublica-d18b 1917.

unlawful raid on his Mar-a-Lago home in Palm Beach, Florida, as well as unlawful targeting in relation to the infamous Russia-collusion hoax. *See id.*

Because President Trump is the Chief Executive, his lawsuits against the United States presented unique challenges. At the same time, Presidents do not forfeit their personal legal rights merely because they are President. Ultimately, the federal defendants agreed to resolve the litigation and pre-litigation FTCA administrative claims without the United States having to give the plaintiffs "monetary payment or damages of any kind," as memorialized by a Settlement Agreement dated May 18, 2026. ECF No. 1-2 at 1. Instead, the plaintiffs would "receive a formal apology." *Id.* The plaintiffs waived all claims that could have been asserted in connection with the litigation and administrative claims process. *Id.* at 2. And the United States agreed to establish "a systematic process to hear and redress claims of others who state that they incurred harm from similar Lawfare and Weaponization" through "The Anti-Weaponization Fund." *Id.*

The Settlement Agreement states that the Attorney General, within 30 days of the settlement, would enter an order to "establish funding and any other relevant requirements, rules, conditions, terms, and waivers" and "issue an order appointing [five] Members, including the Chair." ECF No. 1-2 at 2. "One of the Members shall be chosen in consultation with congressional leadership," and all members would continue in their roles until the Fund concludes, "unless they resign or are removed by the President." *Id.* The Members comprising the Fund would "have the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims." *Id.* And the "Fund may make those procedures public in whole or in part, in its discretion," while "taking reasonable steps to protect private personal and financial information submitted to [the Fund] under th[e] Settlement Agreement." *Id.* at 2, 4.

The Settlement Agreement further states that the "Fund shall have the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights, grant claims in whole or in part, deny claims in whole or in part, defer review of claims, and receive and request evidence or other support for claims, including requesting information from, or consulting with, federal agencies." ECF No. 1-2 at 2–3. And "[o]n a quarterly basis, or otherwise as directed by the Attorney General, The Anti-Weaponization Fund shall provide to the Attorney General a confidential written report that includes the name and address of each claimant who has received any relief and if so, the nature of such relief." *Id.* at 3. The Fund would "cease processing claims no later than December 1, 2028," and the Fund would "transfer [any remaining] balance . . . to the Department of Commerce, Interior, or another appropriate federal government account as designated by the President." *Id.* (citing 43 U.S.C. §§ 1473, 1737(c); 15 U.S.C. § 1522).

The Settlement Agreement states that "[t]o be eligible for relief, a claimant must assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization." ECF No. 1-2 at 3. In evaluating claims, the Fund would "consider the totality of the circumstances," including

> a. The strength of the claim and supporting evidence.
> b. The claimant's actions.
> c. The claimant's actual damages . . . .
> d. Reasonable attorneys' fees paid by the claimant as a result of the Lawfare and Weaponization.
> e. Any time the claimant spent in prison . . . or custody as a result of the Lawfare and Weaponization.
> f. Whether and to what extent the claimant has already obtained any form of relief . . . from any source.
> g. Other factors The Anti-Weaponization Fund deems just and appropriate.

*Id.* at 3–4.

The Settlement Agreement contains a rule of construction stating, "Nothing contained in this Settlement Agreement shall impose on Defendants . . . any duty, obligation, or requirement, the performance of which would be inconsistent with federal statutes." ECF No. 1-2 at 4–5.

On May 18, 2026, the Attorney General issued an order pursuant to the Settlement Agreement. *See* ECF No. 1-4. The order stated that the United States would "provide the U.S. Department of the Treasury with all necessary forms and documentation to direct a payment of $ 1,766,000,000 to an account for the sole use by the Anti-Weaponization Fund" "[w]ithin 60 days." *Id.* at 1. The order also clarified that Fund Members would serve on a volunteer basis. *Id.* And it noted that previous cases have been settled on similar terms. *See id.* at 1–2 (citing, e.g., *Keepseagle v. Vilsack*, 102 F. Supp. 3d 306, 309 (D.D.C. 2015)).[2]

Following this announcement, however, the political process continued to unfold. In the ensuing weeks, the Department, through its official pages, in its court filings, in its representations to courts, and through the testimony of the Acting Attorney General before a Committee of the House of Representatives stated that "we are not moving forward with the Fund, period." House Oversight Hearing, at 40:30-42:50. Thereafter, the Acting Attorney General testified, under oath, to the Senate Judiciary Committee, in his confirmation hearing to be Attorney General of the United States of America that "there is no weaponization fund. The weaponization fund is dead,

---

[2] The *Keepseagle* settlement "created a Compensation Fund . . . of $680,000,000" that would be paid through a "Non-Judicial Claims Process." 102 F. Supp. 3d at 309. Unlike the Anti-Weaponization Fund, which would revert any balance to the federal government, the *Keepseagle* settlement provided for "leftover" money to be distributed to persons and entities that the plaintiffs' class counsel designated as having benefited Native American farmers and ranchers. *See id.* Such persons and entities included "non-profit organizations." *Id.* (alteration omitted). When the non-judicial claims process concluded, "approximately $380,000,000 remained leftover," leading to further settlement modifications and litigation about what persons and entities would receive the remaining funds despite not having submitted claims. *Id.* at 310. The Obama administration also administratively created a voluntary claims process for Hispanic and women farmers, without requiring the filing of a prior lawsuit, by making over $1.3 billion available from the Judgment Fund (plus up to $160 million in debt relief). Department of Justice, *Department of Justice and USDA Announce Process to Resolve Discrimination Claims of Hispanic and Women Farmers* (Feb. 25, 2011), *available at* https://www.justice.gov/archives/opa/pr/department-justice-and-usda-announce-process-resolve-discrimination-claims-hispanic-and-women; *see also Garcia v. Vilsack*, No. 00-2445 (D.D.C.); *Love v. Vilsack*, No. 00-02502 (D.D.C.).

it's not moving forward" and "I am under oath today and I've said it's dead repeatedly." Nomination Hearing at 1:26:42–:49, 2:30:44–47.

In addition to the developments through the political process, the judicial process also brought new developments. Relying on the Acting Attorney General's testimony to the House Committee and the representations of counsel in its papers and in open court, this Court denied a motion for a temporary restraining order and preliminary injunction in the related matter of *CREW*. Case No. 1:26-cv-1789. Across the river, another court gave less credence to the same representations and entered a preliminary injunction on June 12, enjoining any further action relating to the Fund. ECF No. 18; *see Floyd v. U.S. Dep't of Justice*, 1:26-cv-1933 (E.D. Va. June 12, 2026) (ECF No. 85 Order Granting Motion for Preliminary Injunction).

## LEGAL STANDARD

Defendants move to dismiss this action under both Rule 12(b)(1) and 12(b)(6). "Rule 12(b)(1) permits a party to challenge the Court's jurisdiction, whereas Rule 12(b)(6) permits a party to challenge the sufficiency of the Complaint." *Bailey v. Bureau of Prisons*, 133 F. Supp. 3d 50, 53 (D.D.C. 2015) (Leon, J.). "When a defendant files a motion to dismiss a complaint for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence." *Id.* at 54 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "In considering a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the Court is not confined to the letter of the complaint and may 'consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case.'" *Id.* (quoting *Scolaro v. District of Columbia Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C.2000)). This is tied to the Court's "independent obligation to ensure [a]

case falls within the bounds of Article III of the Constitution." *CREW*, Doc. 20 at 5 (citing *TikTok Inc. v. Garland*, 122 F.4th 930, 947 (D.C. Cir. 2024).

On a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Bailey*, 133 F. Supp. 3d at 54 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Although the plaintiff must be given every favorable inference that may be drawn from the factual allegations, the Court need not accept as true 'a legal conclusion couched as a factual allegation,' or inferences that are entirely unsupported by the facts pled in the complaint." *Id.* at 53–54 (quoting *Trudeau v. Fed. Trade Comm'n,* 456 F.3d 178, 193 (D.C.Cir.2006)). And while "the plausibility standard is not akin to a probability requirement … the facts alleged in the complaint 'must be enough to raise a right to relief above the speculative level." *Id.* at 54 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)) (internal quotations omitted). "Thus, to suffice, a complaint must offer in support of its allegations more than mere 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Id.*; *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE

Under Article III, federal courts can exercise jurisdiction over only "Cases" and "Controversies." U.S. Const. Art. III, § 2, cl. 1. "The case or controversy requirement limits the role of the Federal Judiciary in our system of separated powers." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). This Court has already considered the merits of the justiciability of a nearly identical claim in a related matter and—correctly—concluded that the Court lacks jurisdiction to hear challenges to the Anti-Weaponization Fund because such challenges are unripe and moot. *CREW*, Doc. 20 at 1–2.

### A.  Plaintiffs' Claims Are Not Ripe For Adjudication

10

One part of that "justiciability doctrine"—which on its own independently resolves this matter—is "ripeness." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003). The ripeness doctrine is not a mere speedbump; it is a doctrine "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Id.* at 808 (quoting *Reno v. Cath. Social Servs., Inc.*, 509 U.S. 43, 57, n.18 (1993)). For a controversy to be ripe, its "factual components" should be "fleshed out, by some concrete action" that applies to the challenger "in a fashion that harms or threatens to harm them." *Id.*

The Supreme Court has specifically stated that ripeness is lacking when a claim or injury depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). "Dismissal for lack of ripeness is appropriate where '(n)othing in the record shows that appellants have suffered any injury thus far, and the law's future effect remains wholly speculative.'" *Metzenbaum v. FERC*, 675 F.2d 1282, 1290 (D.C. Cir. 1982) (quoting *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 589 (1972)). Or, as the Fourth Circuit has put it: "Where an injury is contingent upon a decision to be made by a third party that has not yet acted, it is not ripe as the subject of decision in a federal court." *Doe v. Virginia Dep't. of State Police*, 713 F.3d 745, 758 (4th Cir. 2013)).

The test for ripeness, requires courts to assess "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park*, 538 U.S. at 808; *accord CREW*, Doc. 20. at 12 (quoting *Cobell v. Jewell*, 802 F.3d 12, 21 (D.C. Cir. 2015)). Plaintiffs have the "burden of proving ripeness, and its allegations are not entitled to presumptive truthfulness." *Beach TV Props., Inc. v. Solomon*, 254 F. Supp. 3d 118, 131 (D.D.C. 2017) (citing *Renne v. Geary*, 501 U.S. 312, 316 (1991)).

When evaluating whether a case is fit for judicial decision, courts consider "whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's decision is sufficiently final." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 463–64 (D.C. Cir. 2006). As discussed, *infra*, there is no final agency action or decision. But there are also not any concrete facts that allow the Court to rule on a purely legal dispute.

There has been (and will be) no concrete action. No Members were appointed. No claims procedures were established. No claims were formally submitted, received, adjudicated, granted, or denied. No claimant received money, let alone engaged in any of the (highly attenuated) conduct that Plaintiffs allege they are concerned about. And the Acting Attorney General's statements to Congress only underscore that all of these events could not occur as Plaintiffs anticipate—in fact, they will not "occur at all." *Texas*, 523 U.S. at 300. Thus, Plaintiff's dubious assumptions about how the Fund might have operated, who it might have compensated, and the injuries that may have caused Plaintiffs underlying the entire compliant are precisely the type of speculative harm the Supreme Court has routinely found are unripe. And for good reason. As a constitutional doctrine, ripeness is "designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park*, 538 U.S. at 807–08 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967)). "Just as the constitutional standing requirement for Article III jurisdiction bars disputes not involving injury-in-fact, the ripeness requirement excludes cases not involving present injury. As the Supreme Court stated in *Whitmore v. Arkansas*, '[a]llegations of possible future injury do not satisfy the requirements of Art. III.'"

12

*Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999) (internal citation omitted).

There is also no hardship to Plaintiffs from this Court withholding consideration of its claims. The bare existence of the Settlement Agreement and corresponding order has no "direct effect on the day-to-day" operations of Plaintiffs. *Texas*, 523 U.S. at 301. And Plaintiffs cannot rely on "abstraction[s]" in the absence of some "primary conduct [that] is affected." *Id.* at 302. The "hardship . . . of biding [their] time" is thus "insubstantial." *Id.* By contrast, requiring the parties to litigate in the abstract, without a concrete set of facts against which to analyze Plaintiffs' claims, would cause the parties significant hardship. It would also cause this Court hardship. "Unnecessary decisions dissipate judicial energies better conserved for litigants who have a real need for official assistance." Wright & Miller, Fed. Practice and Procedure § 3532.1 (3d ed. April 2026 update). The Court should thus let the political resolution regarding the Fund stand on its own.

Ultimately, it is Plaintiffs' burden to establish justiciability, and they cannot do that here.

**B. This Case Is Moot**

This is a rare case that is simultaneously premature *and* already moot. This Court's mootness analysis in *CREW* is correct and should be similarly applied here. This case does not present a "Case" or "Controversy," because "the issues presented are no longer live [and] the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike Inc.*, 568 U.S. 85, 91 (2013) (internal quotation marks omitted). And while it is true that "the initial burden of proving mootness lies with the party claiming it," *Planned Parenthood of Wis., Inc. v. Azar*, 942 F.3d. 512, 516 (D.C. Cir. 2019), the Acting Attorney General's testimony to Congress make it "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Already*, 568 U.S. at 91 (quotation omitted). And that is true "[n]o matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit." *Id.* Because "the court is not

13

empowered to decide moot questions," *People of State of Cal. v. San Pablo & T.R. Co.*, 149 U.S. 308, 314 (1893), this case should be dismissed in its entirety.

This Court has previously—and correctly—applied the presumption of regularity to the Acting Attorney General's public statements and representations of Counsel. *See CREW*, Doc. 20 at 1. Since that time the Acting Attorney General has further reiterated his comments, under oath, at his Senate Hearing to the Attorney General. Nomination Hearing at 1:26:42–1:27:22 (Testifying "is a moot issue, meaning there is no weaponization fund. The weaponization fund is dead, it's not moving forward … The settlement fund is just not moving forward there's no modification it's just it never started no money went from the Treasury to any other account there's no commissioners it's not moving forward."). Based on these, and his prior statements, the challenged conduct can "not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). Accordingly, this case is moot and should be dismissed.

### C. Plaintiffs Lack Standing

Finally, under a traditional standing analysis, this case fails to present an Article III Case or Controversy. Federal courts do not "operate as an open forum for citizens 'to press general complaints about the way in which government goes about its business.'" *All. for Hippocratic Med.,* 602 U.S. at 379 (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)). For the same reason, "taxpayer standing" does not exist just because a plaintiff "challenges [a] Government expenditure." *Hein*, 551 U.S. at 593. "The requirement that the plaintiff possess a personal stake helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of government wrongdoing.'" *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *Valley*

14

*Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 487 (1982)). Standing doctrine also "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge*, 454 U.S. at 472. "[T]he standing requirement means that the federal courts may never need to decide some contested legal questions: 'Our system of government leaves many crucial decisions to the political processes,' where democratic debate can occur and a wide variety of interests and views can be weighed." *All. For Hippocratic Med.*, 602 U.S. at 380 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974)).

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423. "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.* at 431.

The first requirement, "injury in fact," requires an injury that is "real and not abstract," and "particularized" to "the plaintiff in a personal and individual way" (rather than a "generalized grievance"). *All. for Hippocratic Med.*, 602 U.S. at 381 (internal quotation marks omitted). For a concrete harm to exist, an alleged injury must have a "close relationship" to a harm "traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (internal quotation marks omitted). "The most obvious are traditional tangible harms, such as physical harms and monetary harms." *Id.* at 425. Intangible harms are concrete only if they have a sufficient historical pedigree "as providing a basis for lawsuits in American courts." *Id.*

15

To establish causation, a plaintiff must show that his alleged "injury likely was caused or likely will be caused by the defendant's conduct." *All. for Hippocratic Med.*, 602 U.S. at 382. When a plaintiff does not challenge government action "that require[s] or forbid[s] some action by the plaintiff," causation "is ordinarily substantially more difficult to establish." *Id.* (internal quotation marks omitted). That is partly because "plaintiffs attempting to show causation generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'" *Id.* at 383 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 n.5 (2013)). "The causation requirement precludes speculative links" where "downstream injury to plaintiffs" is not "sufficiently predictable," as well as "attenuated links . . . where the government action is so far removed from its distant (even if predictable) ripple effects." *Id.*

To establish redressability, a plaintiff must show "a likelihood that the requested relief will redress the alleged injury." *Steel Co.*, 523 U.S. at 103. Such relief must benefit the plaintiff "as opposed to the citizenry at large" or the "undifferentiated public interest." *Id.* at 106, 107. "[A]lthough a suitor may derive great comfort and joy" from a favorable judgment because they would believe "the United States Treasury is not cheated, that a wrongdoer gets his just deserts, or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Id.* at 107.

As those principles make clear, Plaintiffs flunk the standing inquiry at every step. For the same reasons this case is moot, Plaintiffs cannot establish injury in fact, causation, or redressability. And as an ideological objector to a proposed program that could have resulted in government expenditures, Plaintiffs are no different from the many litigants who have unsuccessfully sought to invoke taxpayer standing. Plaintiffs have no individualized interests distinct from "the interests of the public at large." *Hein*, 551 U.S. at 600; *see* ECF No. 1 (invoking taxpayer standing language

16

in the styling of Counts II and III using the phrasing "Funding of" and "assuming obligations and debts").

The harm, Plaintiffs allege, is that that "Payments from the Fund will be used to finance the operations of those who have threatened and tried to kill Plaintiffs", ECF No. 1 at ¶ 98, even though two paragraphs later the Complaint acknowledges calls for "retribution" and "retaliation" expressly "disclaim[ed] violence" *Id.* at ¶ 100. Despite being inherently contradictory with itself, the Complaint does not allege facts. It alleges speculation; and multiple layers of it. It speculates who the Fund would pay, it speculates what those third parties would do with the money, and it speculates that they would be in danger of imminent bodily harm because of such funding. Indeed, the Complaint asserts "Compensating rioters like Tarrio through the Anti-Weaponization Fund will encourage them to seek that retribution, and furnish them with the resources to bring it about." *Id.* at ¶ 101. This is not a well-pled fact that the Rules of Civil Procedure require. Rather, it is the "unadorned speculation" that cannot establish standing. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976).

Even if this pleading were taken as true, on its face, the pleading attributes the speculative complained of injury to the future, hypothetical violent acts of a third party. Per the Supreme Court, this is precisely the type of pleading that does *not* constitute causation. *All. for Hippocratic Med.*, 602 U.S. at 383 (holding "plaintiffs … cannot rely on speculation about the unfettered choices made by independent actors not before the courts." (internal quotations omitted)). And, as stated above, courts should avoid "presum [ing] illegal activities on the part of actors not before the[m]." *Tel. & Data Sys.*, 19 F.3d at 48.

With no real injury for this Court to redress, there is little doubt what Plaintiffs are actually seeking: the "psychic satisfaction" of a "favorable judgment." *Steel Co.*, 523 U.S. at 107. But

17

federal courts do not "exercise general legal oversight of the … Executive Branch[.]" *TransUnion*, 594 U.S. at 423–24.

## II.    PLAINTIFFS FAIL TO PLEAD ANY COGNIZABLE CAUSE OF ACTION

Given all those justiciability issues, the Court has ample ground on which to dismiss the complaint on the basis of Rule 12(b)(1) alone and it need not reach the substance of the pleadings. That said, Plaintiffs' also fail to allege facts that state a cognizable claim for which relief can be granted under the standard of Rule 12(b)(6). A key factor here is that the Court must take the well-pled facts as true, but the Court need not accept speculation or legal conclusions couched as facts. *Harvey*, 48 F.4th at 269. And all Plaintiffs offer are hypotheticals that boil down to "*If* the Fund went forward, it *could* provide money to certain claimants, who *could,* in turn, use that to commit violent acts." ECF No. 1 at ¶¶ 94–101. These are not facts. They are not even factual allegations. This is pure, unadulterated speculation about how future events would occur or unfold. It is the opposite of the standard requiring plaintiffs to "plead[ ] factual content that allows the court" to assess the claims asserted. *Iqbal*, 556 U.S. at 678. Here, the Complaint does not contain "well pleaded, nonconclusory factual allegation[s]," *id.* at 680, that go beyond the "unadorned, the-defendant-unlawfully-harmed-me accusation" and should be dismissed, *id.* at 678.

### A.  Plaintiffs' APA Claims Must Fail Because There Has Been No Final Agency Action

The Administrative Procedure Act ("APA") contemplates judicial review of "final agency action." 5 U.S.C. § 704. "[T]wo conditions generally must be satisfied for agency action to be 'final' under the APA." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016). "First, the action must mark the *consummation* of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)) (emphasis added). Agency action is

nonfinal, and thus not subject to judicial review under the APA, when it "does not itself adversely affect [the] complainant but only affects his rights adversely on the contingency of future administrative action." *DRG Funding Corp v. Secretary of Housing and Urban Development*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)).

Here, there is no final agency action. Not even close. The Settlement Agreement and accompanying order do not award relief on any claims or even establish formal processes for the Fund to do so—that would have been up to the Members, who were not even appointed. No rights or obligations were determined, and no legal consequences flowed—let alone rights, obligations, or consequences that directly impact Plaintiffs.

First, Plaintiffs argue that the Fund impermissibly creates an Executive Branch "agency." ECF No. 1 at ¶ 104. But (i) this purported agency has no people, processes, or funding; and (ii) the Department of Justice has previously provided for claims administration processes using third-party adjudicators. *See, eg.*, *Keepseagle v. Vilsack*, 815 F.3d 28, 30 (D.C. Cir. 2016). No one suggested the *Keepseagle* adjudicators comprised an "agency." So it would be especially odd to treat the similar and hypothetical Fund as one. Congress may have the "power of the purse" as a general matter, but *Keepseagle* and other similar settlements suggest no violation of the appropriations clause, as Plaintiffs seem to insinuate in Count I. ECF No. 1 at ¶¶118–21.

Next, Plaintiffs' say the Fund "constitutes final agency actions subject to judicial review under 5 U.S.C. §§ 702, 704, and 706" ECF No. 1 at ¶ 104. But this is not true. The creation of the Fund, without further action is a legal nullity. At best, the Settlement Agreement is the *conception* of—not "consummation of"—an agency process. *Hawkes Co.*, 578 U.S. at 597. And even if money was now in the Fund—which it is not—there would still be only tentative, interlocutory action that

19

does not impact Plaintiffs. In fact, Plaintiffs' only argument that as to harm is that funding will flow to specific people who have threatened to harm them. Thus, until a final agency action were to occur that awarded funding to the actors that they claim want "retribution" or "retaliation" against them, their claims are self-defeating. But all of this is academic because Members of the Fund were never appointed, the Fund never adopted any process or standards for evaluating or compensating claims, never received any money, and never disbursed any money.

The best comparator here is APA review in agency grantmaking decisions. In that context, courts have consistently held that an agency does not take final action in the grant context until it completes review of an application and decides whether to award or disburse funds. *See Karst Env't Educ. & Prot., Inc. v. EPA*, 403 F. Supp. 2d 74, 81 (D.D.C. 2005), *aff'd* 475 F.3d 1291, 1295 (D.C. Cir. 2007) (finding that the "district court's decision is unassailable"); *see also Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.*, 174 F.4th 822, 831 (11th Cir. 2026) ("The *agency* has taken no action to fund the project. Even congressional appropriation of funds for a project will not allow challengers to an agency's use of those funds to obtain relief 'until the [agency] has reviewed a grant application and decided to disburse the funds.'" (quoting *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103 (9th Cir. 2007)); *Cnty. of Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 802 F.3d 413, 430–32 (2d Cir. 2015) (considering HUD's rejection of county's proposals and decision to withhold allocated funds was final because it made a definitive funding determination); *City of Philadelphia v. Sec'y U.S. Dep't of Interior*, No. 26-1348, 2026 WL 1755493 (3d Cir. June 18, 2026) (NPS exhibit-removal decisions not final agency action because they did not alter obligations).

Indeed, the scope of APA review for spending decisions is so narrow that agency decisions to *terminate* funding are not even subject to APA review, but are instead governed by the Tucker

Act and routed to the court of Federal Claims. *Vera Institute of Justice v. U.S. Dep't of Justice*, 805 F. Supp. 3d 12, 26 (D.D.C. 2025) (Mehta, J.).

### B. Plaintiffs Ultra Vires and Declaratory Judgment Claims Fail

Plaintiffs also include, barely, an *ultra vires* claim. ECF No. 1 at ¶¶ 169–73. But this claim is so bare-bones that it is difficult to understand what, precisely, the theory of that claim is. Because Plaintiffs have failed to allege facts giving rise to such a claim, it should be dismissed. Defendants also reserve the right to raise any and all arguments responsive to Plaintiffs' *ultra vires* claim in their reply brief given the lack of substance in the Complaint.

As to the Declaratory Judgment count, ECF No. 1 at ¶¶ 174–79, for the same reasons that this case is moot and unripe, any such relief would amount to an advisory opinion.

### CONCLUSION

For the reasons stated above, the Court should dismiss this case with prejudice, pursuant to Rule 12(b)(1) and 12(b)(6).

Date: July 27, 2026

STANLEY E. WOODWARD, JR.
*Associate Attorney General*


/s/ ANDREW J. BLOCK
Andrew J. Block
*Senior Counsel to the Associate Attorney General*
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

*Counsel for Defendants*

21

**<u>Certificate of Service</u>**

I hereby certify that on July 27, 2026, I filed the foregoing document with the Clerk of Court using the Court's CM/ECF system, thereby serving all counsel who have appeared in this case.

/s/ *Andrew J. Block*
Andrew Block